United States District Court
Southern District of Texas
**ENTERED**
October 15, 2025
Nathan Ochsner, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

CHRISTIE PUNGER,                           §
                                           §
        *Plaintiff*,                       §
VS.                                        §        CIVIL ACTION NO. 4:24-cv-2217
                                           §
FARRAH MARTINEZ, PLLC,                     §
                                           §
        *Defendant*.                       §
                                           §
                                           §

## ORDER

Before this Court is Plaintiff Christie Punger's ("Plaintiff" or "Punger") Motion for Summary Judgment. (Doc. No. 17). Defendant Farrah Martinez PLLC ("Defendant") responded, (Doc. No. 18), and Plaintiff replied, (Doc. No. 19). Having considered the briefings, the applicable law, and the summary-judgment evidence, the Court hereby **GRANTS in part** and **DENIES in part** Plaintiff's Motion.

## I.      Background

This case arises out of alleged violations of the Fair Labor Standards Act ("FLSA"). Defendant, Farrah Martinez PLLC, is a Houston-based personal injury law firm with one principal lawyer, Farrah Martinez ("Martinez"). (Doc. No. 17 at 4). Over the past several years, Martinez has hired several staff members who provided secretarial and paralegal support to her firm. (*Id.*). Plaintiff Christie Punger was one of Martinez's staff members. (*Id.*) Punger worked for Defendant as a paralegal from April 2018 to January 2024—a period of nearly six years. (Doc. No. 18 at 6).

The parties' relationship began in 2018 when Punger contacted Defendant through an Indeed job posting for a part-time paralegal position. (Punger Dep, at 47:13–51:13). After an initial phone interview and a subsequent in-person interview, Defendant hired Punger as her part-time

paralegal. (*Id.*) Defendant informed Punger she would start at an hourly rate of $25 an hour, but that Defendant would evaluate her performance after ninety days and potentially raise her pay to $30 an hour. (*Id.*). After Defendant hired Punger, she filled out a W-9 tax form. (*Id.* 52:15–53:18; Doc. No. 18-5). On the W-9, Punger checked the box identifying her tax classification as "Individual/sole proprietor or single-member LLC." (Doc. No. 18-5). There was no box on the W-9 to indicate Punger was an employee for tax purposes. *See* (*id.*). Each year during her employment (excluding 2019 and 2022), Defendant issued Punger a 1099 tax form detailing her compensation for the year. (Doc. No. 18-9) (Punger's 2018, 2020, 2021, 2023, and 2024 1099s).[1] When Punger was hired, both parties agreed that Punger would work from home, and Punger did in fact work from home during her entire tenure with Defendant. (Doc. No. 18 at 6). Martinez officed from her own home, and some of her legal assistants (but not Punger) through the years also worked out of Martinez's home. (Martinez Dep., Doc. No. 18-2 at 15:9–16:11).

When Punger started with Defendant in 2018, her primary job duties included drafting documents such as motions, pleadings, affidavits, discovery requests and responses, initial disclosures, plus communicating with clients regarding their responses to discovery requests. (Punger Dep., Doc. No. 18-2 at 54:4–56:10). Punger testified that in her first few months working for Defendant, she was still applying to other full-time jobs because she was not getting enough hours. (*Id.* at 60:24–63:20). She applied for both legal and non-legal jobs during that time. (*Id.*). However, in 2019 the amount of Punger's work at the firm increased, so from early 2019 onward, she did not apply to any other jobs outside of the firm. (*Id.*).

The parties agree that when Punger started at the firm, she was assigned work "assignment by assignment." (Punger Dep., Doc. No. 18-2 at 54:4–56:9; Doc. No. 18 at 14). To report her time

---

[1] It is unclear to the Court whether Defendant never issued Punger's 1099 forms for 2019 and 2022 or the forms were simply not produced in discovery for this lawsuit.

for payment when she first started, Punger would email Martinez with the number of hours she worked in a week. (Punger Dep., Doc. No. 18-1 at 154:3–155:22). Ultimately, the way Punger reported her time changed. Punger testified that in 2019 Martinez required her to email how many hours she worked each day. (*Id.*). Then, in 2020 and 2021 Martinez requested Punger itemize her daily hours by case so Martinez could see how much time Punger spent working on each case. (*Id.*). In 2022, Martinez requested Punger start billing her time in quarters of an hour, then in tenths of an hour. (*Id.*). Punger was also asked to break down her work more specifically by client. (*Id.*). For example, Punger's timesheet from the two-week period of June 18, 2023, to July 1, 2023, reflected work on at least twenty-one different cases, plus miscellaneous hours spent on other tasks. *See* (Doc. No. 17-7). Martinez testified that she asked Plaintiff to provide more detail in her time entries because it was not clear to Martinez that she was getting her money's worth from Plaintiff's work. (Martinez Dep., Doc. No. 19-2 at 22:11–25:21). Martinez wanted more insight into Punger's work because she thought Punger was billing more hours on certain tasks that should have taken fewer hours. (*Id.*). Martinez also testified that she would occasionally ask Plaintiff about her timesheet entries because it looked like Plaintiff had billed for the same work twice on two timesheets or that Plaintiff took a lot longer on a task than Martinez would have expected. (*Id.*).

In 2021, Punger applied for a Covid-related Paycheck Protection Program ("PPP") loan by completing an online form. (Doc. No. 18- at 10). The loan was approved in April 2021. (Doc. No. 18 at 10). Punger testified that when filling out the PPP loan form she "did not indicate that [she] was an independent contractor," she indicated "[t]hat [she] received a 1099 from [her] employer." Further, she testified, "I did not indicate that I was an independent contractor. That was just the 1099 that I uploaded." (Punger Dep., Doc. No. 18-1 at 76:11–77:10).

Moving into 2022, Plaintiff's workload increased. It was at this point that she started to take on tasks outside of her previous paralegal duties. (Punger Dep., Doc. No. 18-1 at 147:10–154:18). Punger also characterized her work for Defendant as "pretty much" full time at this point. (*Id.* at 63:4–19). At this time, the legal assistant who had been working for the firm since Plaintiff started, separated from the firm. (*Id.*). When this happened, Punger took on the work the legal assistant had been taking care of in addition to her own paralegal duties. (*Id.*). The parties dispute whether Punger was asked to take on these additional duties or whether Punger volunteered to take them on. (*Id.*; Martinez Dep., Doc. No. 18-2 at 40:23–41:4). Regardless, the parties do not dispute that Punger did take on additional work with the departure of the legal assistant.

Punger testified that these additional tasks included tasks like "handle the calendaring deadlines," "administrative tasks," and "handling intake." (Punger Dep., Doc. No. 18-1 at 147:10–154:18). As of 2022, Punger was also taking care of tasks she had never been assigned previously like preparing deposition summaries, pre-litigation matters, demands, medical record summaries, and talking to adjusters and medical providers. (*Id.*). This allegedly continue until Punger's employment with Defendant ended.

In September 2022, Martinez emailed Punger stating, "[y]ou have been with the firm as a contractor for a few years now, let's consider making you a part time employee." (Doc. No. 18-3). Punger responded a few days later asking Martinez to "please let me know the specific details of your expectations from me as a part-time employee, how my schedule or time would work or be affected and what would change for me if I was no longer a contractor at the firm?" (*Id.*). Martinez proposed a time for the two to talk about this proposed change; however, the parties disagree on whether the discussion ever happened. (*Id.*; Doc. No. 17 at 7). Martinez alleges that it was her impression Punger did not want to be an employee with the firm after this exchange. (Martinez

4

Dep., Doc. No. 18-2 at 46:11–22). In contrast, Punger alleges that after she replied to Martinez's email regarding changing her employment status, "[t]here was no other conversation regarding the matter for clarification." (Punger Dep., Doc. No. 18-1 at 88:23–91:20). Punger claims she "[a]bsolutely" would have preferred to be a "W2 employee". (*Id.*). Punger stated she was "under the assumption that [she] was an employee until she received a 1099 from [Martinez] and no taxes were taken out." (*Id.*). Curiously, at this point in time, Punger had already received at least three 1099s in each of the years she had already worked for Defendant. (Doc. No. 18-9) (Punger's 1099s she received in 2018, 2021, and 2022).

In June 2023, Defendant requested Plaintiff designate time in her schedule as dedicated working hours so that Plaintiff was more available to collaborate with Martinez and her legal assistant. The parties agreed that Punger would be available Monday, Wednesday, and Friday from 9:00am to 12:00pm. (*Id.*; Punger Dep., Doc. No. 18-1 at 112:16–113:14). Ultimately, Punger's employment with Defendant ended in January 2024. (Doc. No. 18 at 6). Plaintiff testified that Martinez never specifically said why Plaintiff was terminated, but Martinez testified that Punger sent a forged email to Martinez saying she had allegedly served something on an attorney when in reality Punger had not served that document. (Punger Dep., Doc. No. 18-1 at 140:8–141:11; Martinez Dep., Doc. No. 18-2 at 30:7–31:14).

On June 11, 2024, Punger filed this lawsuit against Farrah Martinez PLLC alleging multiple FLSA violations. (Doc. No. 1). First, Punger claims that Defendant misclassified her as an independent contractor, rather than an employee. (Doc. No. 17 at 9–10). She also claims that Defendant improperly reduced her wages and denied her overtime compensation in violation of the FLSA. (*Id.* at 11–13). Plaintiff filed this Motion for Summary Judgment seeking summary judgment on all of her claims and Defendant's affirmative defenses (Doc. No. 17).

II.    **Legal Standards**

A. **Summary Judgment**

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

B. **Determining an Individual's Status as an Employee or Independent Contractor**

Whether a worker is an employee within the meaning of the FLSA is a question of law, but the determination is "very fact dependent." *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 275

(5th Cir. 2020) (citing *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043–45 (5th Cir. 1987));
*Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 380 (5th Cir. 2019). Summary
judgment on FLSA employee status can be granted when there are facts pointing in both directions
so long as they do not generate a genuine dispute of material fact. *Parrish*, 917 F.3d at 380.

The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. §
203(e)(1). The FLSA requires 'employers' to pay their employees a minimum wage." *Gray v.
Powers*, 673 F.3d 352, 354 (5th Cir. 2012) (citing 29 U.S.C. § 206(a)). Consequently, to find
protection under the FLSA, Plaintiffs must demonstrate that they were in an employer-employee
relationship with Defendants. *Parrish*, 917 F.3d at 380. In the Fifth Circuit, courts apply the
economic realities test to determine if a worker is an independent contractor or an employee.
*Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). This test considers five non-
exhaustive factors:

    (1) the degree of control exercised by the alleged employer;

    (2) the extent of the relative investments of the worker and the alleged employer;

    (3) the degree to which the worker's opportunity for profit or loss is determined by the
        alleged employer;

    (4) the skill and initiative required in performing the job; and

    (5) the permanency of the relationship.

*Id.* "No single factor is determinative." *Id.* Instead, each factor is used to gauge the economic
dependence of the worker, and each factor should be applied with the ultimate concept of economic
dependence in mind. *Id.* The core issue in this inquiry is whether Plaintiff was economically
dependent upon the business to which she rendered services, such that she was not, as a matter of
economic reality, in business for herself. *See Herman v. Express Sixty-Minutes Delivery Serv., Inc.*,

161 F.3d 299, 303 (5th Cir. 1998). Importantly, it "is not what [plaintiff] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive." *Brock*, 814 F.2d at 1047. Here, "as with most employee-status cases, there are facts pointing in both directions." *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993).

### III.    Analysis

### A. Plaintiff's Classification as an Employee or Independent Contractor Under the FLSA

Plaintiff first moves for summary judgment on her status under the FLSA as an employee during her time working for Farrah Martinez PLLC. The Court will address each factor in turn.

### i.    Factor One: Degree of Control

The first factor examines the degree of control Farrah Martinez PLLC exercised over Punger. When analyzing this factor, courts must determine whether a worker has a "viable economic status that can be traded to other . . . companies," keeping in mind that "lack of supervision [of the individual] over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Parrish*, 917 F.3d at 381. "It is not significant how one 'could' have' acted under the contract terms," but rather how the worker acted in economic reality. *Id.* (emphasis added).

Defendant's primary argument on this factor is that Plaintiff held herself out as an independent contractor who was available for contract services to others. Defendant bases this argument on the fact that Plaintiff's LinkedIn page stated, "Contact Christie for services" and that after her employment with Defendant ended, Plaintiff did indeed work for two different law firms during which there was a slight overlap in those contracts. (Doc. No. 18 at 14; Doc. No. 18-7 at 1). Defendant also argues that Plaintiff had a flexible schedule—unlike Defendant's W-2 employees who adhered to an 8:30am to 5:30pm schedule—and Plaintiff decided herself how

much time she would spend on projects. (Doc. No. 18 at 7). Defendant believes that these facts show Farrah Martinez PLLC did not have a high degree of control over Plaintiff's work. (Doc. No. 18 at 14).

In this case, it is not persuasive that, during her employment with Farrah Martinez PLLC, Plaintiff could have worked for other firms. What is important is that while Plaintiff worked at Defendant, she did not work elsewhere. *Parrish*, 917 F.3d at 381 (explaining that it is not significant how one 'could have' acted under the contract terms," but rather how the worker acted in economic reality). Beyond the LinkedIn profile, Defendant has not presented any evidence to suggest Plaintiff was actively seeking other law firm clients to provide her services to throughout the nearly six years she was employed by Defendant. Plaintiff testified that she was initially looking for a different job that would provide more hours, but after her hours at Defendant picked up, she didn't apply to any other job during her tenure with Defendant. (Punger Dep., Doc. No. 18-1 at 60:24–63:20). From the record, it is also not clear when the LinkedIn profile is from. The Court must focus on how Punger acted in economic reality. *Id.*

Plaintiff's primary argument is that Martinez did exercise a high degree of control over Plaintiff's day-to-day work. Plaintiff testified that Martinez "checked in with Plaintiff daily via email, text, Microsoft Teams, and/or Zoom." (Doc. No. 17 at 11; Punger Dep., Doc. No. 17-2 at 125:25–126:7). In her motion, Plaintiff states that Martinez had to approve all of "Plaintiff's work before it was sent or filed on behalf of the Firm," and that "Martinez assigned Plaintiff's daily tasks and work and closely supervised her progress." (Doc. No. 17 at 5). Martinez testified that she never told Punger that she had to use specific templates or processes when completing her work. (Martinez Dep., Doc. No. 18-2 at 71:2–19). However, she acknowledged that she did at times send Punger sample motions that "look[ed] really good and [were] kind of on point" and

suggested to Punger she "use this as a guide." (*Id.* at 71:7–14). At other times, Punger would include material in her drafts that Martinez had never seen and did not suggest to her, which suggested to Martinez that Punger exercised autonomy in her work. *See* (*Id.* at 71:10–14). Martinez and Punger agree that Martinez reviewed everyone's work product before it was filed, including Punger's. (Doc. No. 17 at 5; Martinez Dep., Doc. No. 18-2 at 69:21–70:4).

*Parrish v. Premier Directional Drilling, L.P.* is instructive here. 917 F.3d 369 (5th Cir. 2019). In *Parrish*, the plaintiffs were drilling consultants the court ultimately found to be independent contractors under the FLSA. *Id.* at 375, 388. When examining the control factor, the Fifth Circuit noted that, although the employer did provide an already designed well plan to the consultants, the employer did not dictate how the plaintiffs completed their specific work. *Id.* at 381–82. The plaintiffs, independent of the employer, decided how to complete their specific calculations for the already designed well plan. *Id.*

In some ways, Punger is like the *Parrish* plaintiffs in that Martinez occasionally gave Punger templates or suggestions on how to complete certain drafting projects, but Punger ultimately determined how to complete the projects herself. Nevertheless, Martinez reviewed all of Punger's work before it was filed, which contrasts from the plaintiffs in *Parrish*. In that case, the employer provided an already designed well plan upon which the drilling consultants then did their own specific, independent work. *Id.* at 381–82. There was no indication that their work was then reviewed by the employer that hired them to complete their specific task. *Id.* Here, the fact that Martinez reviewed all of the work after it was complete adds a level of control over Punger's work that was not present in *Parrish*.

The amount of supervision Defendant had over Plaintiff in this case is also in contrast to the plaintiff in *Gray v. Killick Grp., L.L.C.*, 113 F.4th 543 (5th Cir. 2024), *cert. denied,* 145 S. Ct.

1923 (2025). In *Gray*, the plaintiff worked on a project-by-project basis. *Id.* at 550. After accepting

a project for the defendant, plaintiff would perform "his work independently and without

supervision." *Id.* Then, "after completing a project, [the plaintiff] would prepare an invoice to [the

defendant] for payment. *Id.* At no point did the *Gray* defendant review the plaintiff's work or give

guidance on how it should be completed. *See id.*

Here, Defendant closely supervised Plaintiff which is evidenced by Defendant checking in

with Plaintiff daily, Plaintiff's attendance at weekly team meetings, and Martinez's review of all

of Plaintiff's work product. In both *Parrish* and *Gray*, there is no indication the independent

contractor's work was reviewed by the employer after it was completed. These facts give weight

to this factor falling in favor of Plaintiff having employee status.

When evaluating the control factor, the Fifth Circuit has also found it significant when the

employer, at times, assigned the worker with tasks other than that for which they were specifically

hired. *Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 831 (5th Cir. 2020). In *Hobbs*, the

plaintiffs were pipe welders who ultimately were classified as employees. *Id.* at 827, 836. The

court found it persuasive that the plaintiffs' employer required them at times to do work other than

pipe welding, which is what they were specifically hired for. *Id.* at 831. The fact that specialized,

specific hires were asked to do general tasks like work in the maintenance shop or drive a forklift,

supported their classification as employees because at times they were asked to do—and did—

work other than pipe welding. *Id.*

Here, Plaintiff testified that in April 2022, after a former legal assistant had been let go,

Martinez asked Plaintiff to take care of the day-to-day tasks that the legal assistant would normally

do in addition to her own tasks. (Punger Dep., Doc. No. 18-1 at 147:12–149:2). Plaintiff also stated

she was delegated tasks like "handle the calendaring deadlines," "administrative tasks," and

"handling intake." (*Id.*). As of 2022, Punger was also taking care of tasks she had never been previously assigned like deposition summaries, pre-litigation matters, demands, medical record summaries, and talking to adjusters and medical providers. (*Id.*). Plaintiff testified that Defendant went through multiple legal assistants over a period of time trying to find a replacement, and that when one would leave Plaintiff would again be tasked with the administrative and pre-litigation tasks. (*Id.* at 150:7–24).

Martinez does not dispute that Plaintiff did cover some of these tasks; however, Martinez testified that she did not ask Plaintiff to take on these additional legal assistant tasks, but that Punger had reached out, saying she had time available and could help with more tasks. (Martinez Dep., Doc. No. 18-2 at 40:15–41:4). Regardless of who initiated, it remains undisputed that Plaintiff did at times take on the general administrative tasks for the firm beyond her specific paralegal work—with Martinez's approval.

When considering the degree of control factor, keeping in mind the touchstone of Plaintiff's *actual* economic realities, this factor tends to support Plaintiff's classification as an employee under the FLSA. Martinez reviewed all of Plaintiff's work and assigned her work outside of her specific paralegal scope. Plaintiff had some freedom to execute the work how she saw fit but ultimately Plaintiff was not a "separate economic entity" when considering the level of control Farrah Martinez PLLC had over her work. *See Mr. W Fireworks*, 814 F.2d at 1049.[2]

This factor favors a finding of employee status.

---

[2] While neither side cited an attorney's ethical obligations, the Court notes that in an attorney-paralegal relationship an attorney has ethical duties regarding oversight of the paralegal. Pursuant to Texas Disciplinary Rule of Conduct 5.03, a lawyer has the duty to supervise a non-lawyer assistant and may be subject to discipline for the actions of their non-lawyer assistants, such as paralegals. *See* Tex. Disciplinary Rules Prof'l Conduct R. 5.03, *reprinted in* Tex. Gov't Code Ann. Tit.2, subtit. G, app. A (West 2013). An attorney could also face civil liability for the acts or omissions of his or her paralegal.

ii.    **Factor Two: Extent of Relative Investments**

Next, the Court considers the relative investments of Punger and Farrah Martinez PLLC. *Hobbs*, 946 F.3d at 831. Neither party spends more than a few sentences addressing this factor. Plaintiff states that when workers are obligated to provide their own supplies and materials for the job, it is more likely they are independent contractors. (Doc. No. 19 at 5–6). Despite that, she notes that Defendant required Plaintiff "to provide her own software to complete Bates stamping and other Firm tasks." (Doc. No. 17 at 5). Plaintiff simultaneously argues that she was not obligated to provide any supplies or materials to begin working for Defendant, and that when Plaintiff's personal laptop stopped working, Martinez let her use a company laptop and mouse. (Doc. No. 19 at 6). Plaintiff also testified that at one point Defendant required Plaintiff to attend a CLE event, but when Plaintiff submitted her timesheet for the CLE, Defendant said since Plaintiff was a contractor Defendant was not required to pay her for the time she spent at the CLE. (Punger Dep., Doc. No. 18-1 at 93:8–94:1). Defendant argues in response that it "did not have to invest any money to obtain [Plaintiff's] contract services, as Plaintiff worked from home and used her own equipment." (Doc. No. 18 at 15).

This factor carries less weight in this case. Plaintiff invested in the software required for Bates stamping and other job duties, and Defendant allowed Plaintiff to use a laptop Defendant owned. Plaintiff also testified at one time she was not compensated for attending a CLE Defendant required her to go to. When compared to the types of significant investments courts have previously found, these investments are relatively minor on both sides, though Plaintiff may have invested slightly more than Defendant. *See Parrish*, 917 F.3d at 832 (finding defendant invested more than individual plaintiffs when the defendant invested "tens of thousands of dollars per welder"); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976) ("But for [defendant's]

provision of all costly necessities, these operators could not operate."). As such, this factor weighs slightly in favor of Defendant's claim that Plaintiff was an independent contractor but overall carries less weight as neither party's investments were significant.

### iii.    Factor Three: Degree of Control Over Opportunity for Profit or Loss

The third factor is "the degree to which the worker's opportunity for profit or loss is determined by the alleged employer". *Hopkins*, 545 F.3d at 343. In other words, courts consider "whether the worker or the alleged employer controlled the major determinants of the amount of profit which the worker could make." *Id.* at 344.

This is another factor the parties spend little time addressing in their briefs. Plaintiff argued that "[o]n a minimum of five different occasions, she submitted timesheets showing she worked more than 40 hours in a week, and each time, Martinez would schedule a phone conversation to discuss the submitted timesheets." (Doc. No. 17 at 13). Plaintiff also contends that after these timesheet discussions, "[Martinez] made deductions from Plaintiff's pay," and would revise and contest Plaintiff's timesheets. (*Id.*). In its response, Defendant states that it "reviewed and infrequently challenged entries via email or text." (Doc. No. 18 at 9). Martinez testified that sometimes she would question the hours Punger assigned to certain tasks that Martinez felt were repetitive and should not have been taking as long as Punger took on them. (Martinez Dep., Doc. No. 18-2 at 23:16–25:21).

This timesheet discussion and modification practice suggests Plaintiff's opportunity for profit or loss was ultimately determined by Defendant; however, the infrequency of any actual conflict over her hours suggests a certain degree of independence. Plaintiff was paid hourly and exclusively worked with Defendant during her tenure, so Defendant potentially modifying her total hours would directly reduce Plaintiff's opportunity for profit. Plaintiff did not work for any other

law firm during her nearly six-year tenure, so Plaintiff could not have made up the hours Defendant allegedly removed by working with another client.

Additionally, Martinez testified that when she assigned work, she always gave Punger the choice to reject an assignment. (Martinez Dep., Doc. No. 18-2 at 34:5–35:22). Importantly, Martinez does not recall a time Punger actually did say no and reject an assignment. (*Id.*) Instead of outright rejecting an assignment, Martinez testified that Plaintiff would sometimes explain circumstances that prevented her from doing work by the required time, such as child related activities or a vacation. (*Id.*) The fact that a plaintiff is free to accept or reject any project supports her classification as an independent contractor. *See Parrish*, 917 F.3d at 381. Nevertheless, when a plaintiff, in reality, never does refuse to work on an assigned project, that fact cuts against independent contractor status. *Hobbs*, 946 F.3d at 830. Here, Defendant admits Plaintiff never declined an assignment, which weighs against Plaintiff's potential status as an independent contractor.

Moreover, it is important to the opportunity for profit or loss inquiry that during the years she worked for Defendant, Plaintiff's year end profits or losses depended solely on the work sent to her by the Defendant. It did not depend on her ability to "find work with other companies consistently or other work generally." *Hobbs*, 946 F.3d at 833. In *Hobbs*, the plaintiffs worked exclusively for the defendant for almost three years and worked for no other company when they worked for the defendant. *Id.* Though the plaintiffs worked for other companies in the years before and after their tenure with the defendant, the court found they were unlike other workers who supplemented their income with work for outside companies while they worked for their employer. *Id.*

*Hobbs* controls here. Both parties agree Plaintiff worked exclusively for Defendant during her nearly-six-year employment. Defendant argued that because Plaintiff started working for other law firms after her employment with Defendant ended, Plaintiff could have obtained other employment during her time working for Defendant. The record, however, reflects that while Plaintiff was working for Defendant, she did not rely on other law firms to supplement her income. This fact also supports Plaintiff's classification as an employee.

After reviewing the record, the opportunity for profit or loss factor supports classifying Plaintiff as an employee. Plaintiff worked exclusively for Defendant, and Defendant exercised influence—if not control—over Plaintiff's final timesheets and payment. Plaintiff never directly rejected an assignment Defendant gave her. Each of these facts supports the conclusion that Defendant influenced Punger's opportunity for profit or loss to a high degree.

### iv.    Factor Four: Skill and Initiative Required

The Court next examines whether the worker exhibits the type of skill and initiative typically indicative of independent contractor status. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 345 (5th Cir. 2008). "Greater skill and more demonstrated initiative counsel in favor of [independent contractor] status." *Parrish*, 917 F.3d at 385.

Based upon their briefs, neither party finds this factor to be significant. Defendant argues that Punger was retained "because she had specialized skills and experience as a paralegal necessary to complete the litigation assignments." (Doc. No. 18 at 15). Plaintiff counters that she "was employed by Defendant to provide legal services, [but she] held no paralegal or legal assistance certifications. (Doc. No. 17 at 11). Punger testified that she earned an associate degree in paralegal studies and had previously worked at a law firm for four years as a legal assistant and

then as a paralegal. (Punger Dep., Doc. No. 18-1 at 26:8–29:24). Plaintiff does not, however, have a paralegal or legal assistant certification in Texas. (*Id.*).

Paralegals can provide important and skilled services to law firms and lawyers, and generally speaking, the more experience they have the more helpful they can be. That being said, Plaintiff has no specialized or advanced paralegal certification or training, although many skilled paralegals do not carry such certifications. [S]kills that are not 'specialized' but rather are 'common' to all employees in that position counsel against [independent contractor] status." *Parrish*, 917 F.3d at 385 (quoting *Hopkins*, 545 F.3d at 345). Additionally, when workers are occasionally paid to perform work that does not require their specialized skills, it is less likely they will be found to be independent contractors. *Hobbs*, 946 F.3d at 834. As the Court addressed above, Punger did at times handle administrative and pre-litigation tasks for Defendant that did not fall under her paralegal job duties. *Cf. Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 275 (5th Cir. 2020) (finding the fact that defendant employer gave plaintiff "specific projects–like analyzing contracts or evaluating litigation exposure–precisely because of [plaintiff's] legal education and experience" supported finding him an independent contract due to his skill and initiative).

Here, the Court finds the skill and initiative factor, like the prior factors, is a close call, but the final analysis supports classifying Plaintiff as an employee. Punger possessed the base qualifications of a paralegal but did not possess an advanced degree or certification. She got all of her work from Martinez, and Martinez reviewed and approved it before it was filed.

### v.   Factor Five: Permanency of the Relationship

Employee status is more likely to be found when a worker works exclusively for an entity on a permanent basis. *See Hopkins*, 545 F.3d at 345–46. When evaluating this factor, courts consider whether plaintiff worked exclusively for defendant, the total length of the relationship

between the parties, and whether the work was on a "project-by-project basis." *Parrish*, 917 F.3d at 386–87.

It is undisputed that Punger worked for Defendant from April 2018 to January 2024, a length of time just short of six years. (Doc. No. 18 at 6; Punger Dep., Doc. No. 18-1 at 79:18–80:8). It is also undisputed that, during her employment, Punger worked exclusively for Farrah Martinez PLLC. (Punger Dep., Doc. No. 18-1 at 14:24–15:3; Martinez Dep., Doc. No. 18-2 at 59:20–23). Both of these facts demonstrate Punger and Defendant had a long term and exclusive relationship, that weighs in favor of a permanency finding. *See, e.g.*, *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009) (finding eleven months a substantial period of time which contributed to a permanency finding); *Hobbs*, 946 F.3d at 834–35 (finding employees with an exclusive tenure of three years and six months respectively both worked for a substantial amount of time for defendant).

The parties also both state in their briefs that Plaintiff's position was inherently a "project-by-project position," which would cut against a finding of permanency. (Doc. No. 19 at 4; Doc. No. 18 at 14). Plaintiff testified that when she started working for Defendant, she "was given tasks as an assignment at a time, [but] over the course of the years, while working for the Defendant, [her] duties changed . . . and her workload increased." (Punger Dep., Doc. No. 18-1 at 54:4–55:9). In support of her claim, Plaintiff maintains that she started work at 8:30am and "basically, all day [she] was just ready to do anything that [Martinez] asked [her] to do." (Punger Dep., Doc. No. 18-1 at 137:12–138:23). In contrast, Martinez testified that, when Punger started, Punger would simply send Martinez her total number of hours worked, rather than invoice her for a specific project. *See* (Martinez Dep., Doc. No. 18-2 at 22:11–23:20). When explaining why she asked Plaintiff to start sending her a more detailed breakdown of her billable hours, Martinez testified

that she asked Punger to "start letting [her] know what cases [Punger] was working on and what hours." (*Id.*).

Plaintiff's working relationship with Defendant is somewhat in contrast with how the Fifth Circuit has characterized a project-by-project basis. *Gray v. Killick Grp., L.L.C.*, 113 F.4th 543 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1923 (2025). In *Gray*, the defendant provided inspection services, and the plaintiff was an inspector working on defendant's inspection projects. *Id.* at 547. Even though the plaintiff performed inspection services for defendant over the span of seven years, that work was all assigned project-by-project. *Id.* The court described the project-by-project process as follows: "Killick finds the appropriate third-party inspector to meet the needs of the customer. If the inspector confirms a willingness to work on a project, Killick then proposes the inspector to the customer. If the customer selects Killick's inspector and the inspector accepts the assignment, the inspector then performs the inspection and prepares a report of findings." *Id.* Importantly, the plaintiff provided inspection services to other entities beyond the defendant. *Id.* Killick would engage the plaintiff-inspector to perform a specific inspection, and Killick worked with other inspectors in addition to the plaintiff. *See id.*

This description of project-by-project work is in contrast with the working relationship between Punger and Defendant. Punger worked exclusively for Defendant for nearly six years. Though her employment may have more closely resembled a traditional project-by-project relationship at the beginning of her employment, around April 2022, it morphed into something that more closely resembled an employee being available to work on any task given by the employer. For example, Plaintiff's timesheet for the period of June 18, 2023, to July 1, 2023, reflects that Punger worked on at least twenty-one different cases and spent additional hours on miscellaneous tasks. (Doc. No. 17-7). Some of the timesheet entries include "Trial Prep," including

reviewing witness lists and exhibits, "call to client and son to verbally get her discovery responses," getting "referrals for depo cuts," and returning calls, texts, emails, and faxes, among numerous other tasks. (*Id.*). This timesheet suggests that at least by 2023, Punger took care of many tasks Defendant might need on a case, rather than taking on work assignment by assignment. Based on Punger and Martinez's testimony, this likely was the case as of April 2022 when Punger took over the legal assistant work in addition to her paralegal tasks.

Overall, the permanency factor supports Punger's classification as an employee, rather than an independent contractor. Punger reported practically every day to work for Defendant, her workload increased over time, and she took on administrative work when the firm was without a legal assistant. Punger also worked exclusively for Defendant during that time. Plaintiff was assigned work on numerous ongoing cases Defendant had, rather than specific cases or projects.

### vi.    Additional Factors

The economic realities factors are non-exhaustive, and courts can consider additional factors in their analysis. *Parrish*, 917 F.3d at 387. Here, the record reflects additional evidence that weighs heavily in favor of Plaintiff being classified as an independent contractor under the FLSA.

It is undisputed that when Plaintiff began working for Defendant, she filled out a W-9 tax form, rather than a W-4 form.[3] (Doc. No. 18-5). Additionally, for at least four of the six years of Punger's employment, Defendant issued Plaintiff a 1099 form for tax filing purposes. (Doc. No.

---

[3] According to the IRS, "[i]f you've made the determination that the person you're paying is an independent contractor, the first step is to have the contractor complete Form W-9." *Forms and Associated Taxes for Independent Contractors*, IRS, https://www.irs.gov/businesses/small-businesses-self-employed/forms-and-associated-taxes-for-independent-contractors (last updated Sep. 30, 2025). A W-9 is different than a W-4, which is typically completed "so that [an] employer can withhold the correct federal income tax from [an employee's] pay." *About Form W-4, Employee's Withholding Certificate*, IRS, https://www.irs.gov/forms-pubs/about-form-w-4 (last updated Sep. 12, 2025).

18-1 at 45:9–46:22).[4] On the corner of each 1099, the words "Nonemployee Compensation" are clearly depicted. (Doc. No. 18-9). Also clearly depicted on each 1099 is that $0.00 of federal income tax was withheld. (*Id.*). Despite receiving annual 1099s since 2018 with clear indications she was not being compensated as an employee and that she had no federal income tax withheld, Plaintiff testified that she first learned she was considered a contractor and not an employee in 2019. Plaintiff gained this understanding because Martinez asked her to provide her own software for Bates stamping documents, since she was a contractor. (Punger Dep., Doc. No 18-1 at 88:23–95:22). Despite that testimony, Plaintiff also testified that she could not recall when she learned that she was considered an independent contractor—that it could have been 2019, 2021, or 2022. (*Id.*).

Moreover, in 2021 Punger applied for and received a Small Business Administration PPP loan. (Punger Dep., Doc. No. 18-1 at 146:11–147:9). The Small Business Administration made it clear that "[s]ole proprietors, independent contractors, and self-employed persons" were eligible for PPP loans—not employees.[5] In fact, in filling out her PPP paperwork, Plaintiff should have had to certify that she was an "independent contractor, eligible self-employed individual, or sole proprietor" or an employer with no more than 500 employees.[6] Though neither party has presented Plaintiff's actual PPP loan application, Plaintiff testified that she did apply for the loan and that, though she claims not to recall the specifics of the form, she was "sure that [the form] does" require

---

[4] Again, it is not clear to the Court from the record whether the 2019 and 2022 1099s were never issued or simply were not produced in this litigation.

[5] *See First Draw PPP Loan: Who May Qualify*, U.S. SMALL BUS. ADMIN., https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan (last updated Oct. 3, 2024).

[6] *Paycheck Protection Program Borrower Application Form Revised June 12, 2020 (SBA Form 2483)*, SMALL BUS. ADMIN., https://www.sba.gov/sites/default/files/2020-06/PPP%20Borrower%20Application%20Form%20%28Revised%20June%2012%202020%20%29-Fillable-508.pdf (last updated June 12, 2020).

the applicant to swear under oath that the facts represented are true and correct. (Punger Dep., Doc. No. 18-1 at 75:11–77:16). Punger's explanation as to how she reconciles her application for the PPP loan and her belief that she was not an independent contractor is as follows: Punger testified that on the PPP loan form she "did not indicate that [she] was an independent contractor," instead she indicated "[t]hat [she] received a 1099 from [her] employer." Further, she testified, "I did not indicate that I was an independent contractor. That was just the 1099 that I uploaded." (Punger Dep., Doc. No. 18-1 at 76:11–77:10). Punger testified to this despite the fact that she had been receiving 1099s and those 1099s explicitly informed her of her "Nonemployee Compensation." (Doc. No. 18-9).

This evidence is troubling to the Court. The repeated 1099s over multiple years should have indicated to Plaintiff or at least to a reasonable person that she was being compensated as a "nonemployee." (Doc. No. 18-9). In addition, Plaintiff clearly applied for a PPP Loan, almost certainly certifying to the Federal Government that she was an independent contractor in the process. How Plaintiff could honestly make this application while simultaneously maintaining that she did not believe or know she was an independent contractor perplexes the Court. As such, these facts heavily tilt the scales towards finding Plaintiff to be an independent contractor.

### vii.    Conclusion Regarding FLSA Status

This case, like many FLSA status cases, presents a very close call. After engaging in the fact-intensive inquiry the economic-realities test requires and adhering faithfully to this Circuit's precedent, the Court finds that the degree of control, opportunity for profit or loss, skill and initiative, and permanency factors all support classifying Plaintiff as an employee. The relative investments factor slightly favors Plaintiff's status as an independent contractor, but as the Court discussed previously, that factor carries less weight than the other factors in this specific factual

situation. That being the case, the fact that Plaintiff received numerous 1099s throughout her employment and applied for and received a PPP loan explicitly limited to independent contractors and the like, weighs heavily in favor of finding Plaintiff as an independent contractor.

Examining Plaintiff's employment as a whole, a distinction can be drawn between her first few years of employment and her last few years of employment. The degree of control Defendant had over Plaintiff's work, the variety of work Plaintiff was doing, and the hours she alleges that she worked all increased substantially in April 2022 when Defendant's legal assistant left the firm. At this point, Punger's job duties and her relationship to Defendant shifted. Punger also applied for the PPP loan before this shift in her duties. Overall, the economic reality in this case is that Plaintiff was an employee of Defendant, for FLSA purposes, only after her duties shifted in 2022. At that point, Plaintiff was not, as a matter of economic reality, in business for herself. *See Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998). Therefore, the Court **GRANTS** Plaintiff's Motion for Summary Judgment as to Punger's classification under the FLSA subject to the following modifications. The Court finds that Punger was an employee but limits that finding to only include the time Punger worked for Defendant after April 1, 2022. Before April 2022, the Court finds Punger was an independent contractor under the FLSA.

## IV.    Failure to Pay Overtime Wages under 29 U.S.C. § 207

Plaintiff has also moved for summary judgment on her claims in addition to her status under the FLSA. The FLSA provides that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Under the *Mt. Clemens* standard, an employee bringing an action for unpaid overtime compensation must first demonstrate by a

preponderance of the evidence: (1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due. *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014). Once the employee establishes a prima facie case, the burden then shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005)).

In her motion, Plaintiff alleges that she "kept track of her hours and submitted them to Defendant for review and approval." (Doc. No. 17 at 13). Further, Plaintiff claims "[o]n a minimum of five different occasions, Plaintiff submitted timesheets showing she worked more than 40 hours in a week, and each time, Martinez would schedule a phone conversation to discuss the submitted timesheets." (*Id.*). Plaintiff alleges that Martinez rejected and revised the hours Plaintiff submitted before paying her. (Id.). To support her argument, Plaintiff cites her deposition testimony, where she testified that she worked over forty hours during the week over five times and Martinez modified her timesheet. (Punger Dep., Doc. No. 18-2 at 123:8–124:17). Martinez also cites to

In response, Defendant argues that Martinez only reviewed Punger's timesheets and infrequently challenged her entries via email or text. (Doc. No. 17 at 9). In her deposition, Martinez acknowledged there were hours she questioned on Punger's timesheets. (Martinez Dep., Doc. No. 18-2 at 23:17–25:21). That being the case, Martinez testified that she only questioned Punger about activities Martinez thought were taking longer than they should have. (*Id.*). For example, Martinez questioned Punger about why it would take "half an hour to text a client," or why a disclosures

response would take "10 to 12 hours" when "you're just replicating the same forms over and over." (*Id.*). Martinez then testified that after she inquired with Punger about these types of asks, Punger would go back and look at her timesheet and make corrections, like correcting a task that had been billed for in the previous pay period, or she would revise the amount worked to more accurately reflect the number of hours it took. *See* (*id.*). Martinez insists in her deposition testimony that she paid Punger for all the hours she worked. (*Id.*).

Here, a genuine dispute of material fact exists regarding the third element of Plaintiff's overtime claim: that the employer violated the FLSA's overtime wage requirements. In their respective sworn deposition testimony, Plaintiff and Martinez disagree on whether Martinez deducted Plaintiff's hours when she billed over forty hours in a week, and on whether Plaintiff was compensated for all of the hours she worked. Plaintiff has provided some of her timesheets as evidence but has not directed the Court to specific timesheets that would demonstrate a specific amount of overtime pay Plaintiff was deprived of. Since there is a genuine dispute as to whether Defendant violated the FLSA's overtime provisions, Plaintiff is not entitled to judgment as a matter of law on her overtime claim. Plaintiff's Motion for Summary Judgment on her overtime claim is **DENIED**.

### V.    Failure to Pay Minimum Wage under 29 U.S.C. § 206

The elements of an FLSA unpaid overtime wage claim, explained above, generally apply to an FLSA claim for unpaid minimum wage as well. *See Worsham v. B.G. Prop. Mgmt., LLC*, No. 4:16-CV-2712, 2020 WL 7353906, at *9 (S.D. Tex. Sept. 4, 2020). The plaintiff must show that there existed an employer-employee relationship during the unpaid minimum wage periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's minimum wage requirements; and (4) the amount of minimum wage

compensation due. *See Johnson*, 758 F.3d at 630. In addition, an employee must establish that the employer failed to pay the employee at least $7.25 per hour. 29 U.S.C. § 206(a)(1)(C).

Though her motion does not make clear the factual basis for her minimum wage claim, Plaintiff's complaint states that "Plaintiff was paid at an hourly rate of $0.00 per hour for over a month of work (July 2, 2023, to August 12, 2023), totaling 61.5 hours for which Plaintiff was not paid. (Doc. No. 1 at 10). Plaintiff's claim stems from an alleged "payroll error" that resulted in duplicate payments to everyone in the firm. (Doc. No. 17 at 12–13). Plaintiff claims Defendant withheld her paycheck after the overpayment until Plaintiff "worked off" the error. (*Id.*).

Defendant argues in response that there was no improper withholding of wages. (Doc No. 18 at 11). After the duplicate payroll error occurred by the payroll vendor, that resulted in overpayment to both Punger and the legal assistant, Defendant corrected the overpayment over the next period. (*Id.*). Defendant also cites Chasity Ferguson's deposition, who was Defendant's legal assistant at the time of the overpayment, who testified that she received all of her pay and was paid the required overtime. (*Id.*).

There remains a genuine dispute of material fact as to whether Defendant failed to pay Plaintiff the required minimum wage under the FLSA during this overpayment period. Plaintiff has not made it clear whether she was deducted wages in this period beyond the overpayment amount. As such, her Motion for Summary Judgment on her minimum wage claim is **DENIED**.

## VI.    Plaintiff's FLSA Retaliation Claim

Plaintiff states that she has moved for summary judgment "on her claims," but she does not address her FLSA retaliation claim in her motion or her reply. *See* (Doc. No. 17; Doc. No. 19). The FLSA provides a retaliation cause of action against an employer who discriminates against an employee for exercising her legal rights. 29 U.S.C. §§ 215(a)(3) & 216(b). The elements of a

retaliation claim are: "(1) participation in protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action." *Hagan v. Echostar Satellite, LLC*, 529 F.3d 617, 624 (5th Cir. 2008).

Plaintiff has moved for summary judgment here, so she must establish "beyond peradventure *all* of the essential elements" of her claim. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Plaintiff has not discussed this claim at all, so she has not met her required burden. Therefore, her Motion for Summary Judgment on the retaliation claim is **DENIED**.

## VII.   Plaintiff's Recordkeeping Violation Claim

Plaintiff argues that Defendant violated the FLSA's record keeping provisions under 29 U.S.C. § 211, stating that Defendant made Plaintiff track her own hours and that Martinez was the only individual involved in the preparation, review, and approval of payroll and timekeeping records. (Doc. No. 17 at 13–14). The FLSA requires that employers "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time...as [the Department of Labor] shall prescribe by regulation." 29 U.S.C. § 211(c). Regulations from by the Department of Labor specify the information these records must contain and how long employers must keep them. *See* 29 C.F.R. § 516 *et seq*.

Fatal to Plaintiff's claim is the fact that the FLSA's recordkeeping provisions do not create a private right of action. *Lobo v. Sprint Safety, Inc.*, No. 4:19-CV-3934, 2020 WL 1659888, at *2 (S.D. Tex. Mar. 30, 2020) (collecting cases); *Sanders v. Michaud Constr. Grp., LLC*, No. 18-CV-00423, 2018 WL 5915048, at *3 (W.D. La. Oct. 12, 2018) ("The FLSA's recordkeeping requirement does not create a private right of action, and only the Department of Labor is

empowered to enforce the recordkeeping provisions of the FLSA."). Accordingly, Plaintiff's Motion for Summary Judgment on her recordkeeping violation claim is **DENIED**.

### VIII.   Defendant's Statute of Limitations Defense

Plaintiff also moves for summary judgment on Defendant's good faith defense. The FLSA contains a two-year statute of limitations period for a plaintiff to bring her claim after it accrues, which is extended an extra year for willful violations. 29 U.S.C. § 255(a). For an unpaid overtime compensation claim under the FLSA, "[a] cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 271 (5th Cir. 1987), *modified on other grounds,* 862 F.2d 2 (5th Cir. 1987).

The word "willful" is "considered synonymous with such words as 'voluntary,' 'deliberate,' and 'intentional.'" *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). A willful violation occurs when the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited. Plaintiff bears the burden of establishing the defendant's willfulness. *Ikossi–Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 552 (5th Cir. 2009). To show reckless disregard, merely negligent or unreasonable conduct is not sufficient. *See Steele v. Leasing Enters., Ltd.*, 826 F.3d 237, 248 (5th Cir. 2016).

Here, Plaintiff argues that Defendant willfully violated the FLSA because Martinez "is an attorney, a business owner, who clearly and correctly demonstrated understanding of the distinction between an independent contractor and a W-2 employee." (Doc. No. 19 at 7). To support this allegation, Plaintiff cites Martinez's testimony stating, "[A]n employee is someone that you exercise control over in the workplace situation and an independent contractor is someone who you do not exercise control over." (Doc. No. 19-2 at 10). Plaintiff also points out that after she left

Martinez's firm, Martinez engaged a "true contract paralegal with her own contracting paralegal firm." (Doc. No. 19 at 8). Plaintiff contrasts Martinez's work relationship with Plaintiff to her relationship with this contract paralegal, stating that Martinez gets an email from the contract paralegal at the end of each assignment, and this paralegal works for "several other attorneys and/or firms, not just Defendant." (*Id.*).

In its response, Defendant counters that "Defendant classified Plaintiff as an independent contractor based on the understanding of Plaintiff's autonomy and experience and without any intent to evade the FLSA." (Doc. No. 18 at 17). Defendant points out that Martinez offered Plaintiff to convert to a part-time employee, but that Plaintiff "rejected that offer." (*Id.*).

At this time, Plaintiff has not met the high bar of willful conduct by Defendant. In addition, the fact that Defendant repeatedly issued Plaintiff 1099 tax forms and did not withhold any federal income taxes for Plaintiff, will likely make any willful finding difficult to achieve. Nevertheless, there remains a genuine dispute of material fact regarding Defendant's state of mind, and so Plaintiff's Motion for Summary Judgment on applicability of the three-year FLSA statute of limitations is **DENIED**.

## IX.    Defendant's Good Faith Defense

An employer that violates Section 207 of the FLSA may be held liable for the unpaid overtime hours and "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Liquidated damages are awarded unless a defendant can establish that it acted in good faith and had reasonable grounds for believing that its act was not a violation of the FLSA. 29 U.S.C. § 260. The employer bears the "substantial burden" of demonstrating good faith. *Singer v. City of Waco*, 324 F.3d 813, 823 (5th Cir. 2003). The Fifth Circuit has held that good faith includes "some duty to investigate potential liability under the FLSA" and that ignorance cannot be the basis of a

reasonable belief. *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979). A court may grant liquidated damages even if an employer demonstrates that it acted in good faith. *See, e.g.*, *Heidtman v. County of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999).

The issue of good faith is not appropriate for summary judgment because the facts surrounding Plaintiff's overtime claim against Defendant are in dispute. *Molina-Torres v. Harris Cnty., Texas*, No. 4:23-CV-1786, 2025 WL 73118, at *8 (S.D. Tex. Jan. 10, 2025). Here, the parties dispute whether Defendant violated the FLSA in regard to overtime work. As the good faith defense relates to an employer's violation of Section 207 of the FLSA, summary judgment is inappropriate at this time. Plaintiff's Motion for Summary Judgment on Defendant's good faith defense is **DENIED**.

### X.   Defendant's Lack of Knowledge Defense

Plaintiff next moves for summary judgment on Defendant's lack of knowledge defense. (Doc. No. 17 at 15).

An employee "cannot prevail on an FLSA overtime claim if that 'employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work.'" *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 (5th Cir. 2016) (quoting *Harvill v Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005)). On the other hand, "[a]n employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." *Fairchild*, 815 F.3d at 964.

Plaintiff argues that she submitted timesheets to Martinez with hours worked in excess of forty hours, so Martinez was on notice of Plaintiff's overtime and cannot claim the lack of knowledge defense. (Doc. No. 17 at 17). Defendant states that it "reviewed and infrequently

challenged entries via email or text." (Doc. No. 18 at 9). Martinez testified that sometimes she would question the hours Punger assigned to certain tasks that Martinez felt were repetitive and should not have been taking as long as Punger took on them. (Martinez Dep., Doc. No. 18-2 at 23:16–25:21).

As previously discussed, there remains a genuine dispute of material fact regarding whether Martinez committed an overtime related FLSA violation. In their respective sworn depositions, Plaintiff and Martinez disagree on whether Martinez deducted Plaintiff's hours when she billed over forty hours in a week, and on whether Plaintiff was compensated for all of the hours she worked. Therefore, a genuine dispute of material fact prevents judgment as a matter of law on this defense. The Plaintiff's Motion for Summary Judgment on Defendant's lack of knowledge defense is **DENIED**.

### XI.   Defendant's Portal-to-Portal Act and Motor Carrier Act Defenses

Finally, Plaintiff moves for summary judgment on Defendant's defenses under the Portal-to-Portal Act and Motor Carrier Act. (Doc. No. 17 at 16).

The Portal-to-Portal Act exempts employers from liability for FLSA claims based on activities like traveling to and from a jobsite. *See Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222, 225 (5th Cir. 2017) (citing 29 U.S.C. § 254(a)). The Motor Carrier Act FLSA exemption provides that the "right to overtime does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to section 31502 of title 49." *Ash v. Flowers Foods, Inc.*, No. 23-30356, 2024 WL 1329970, at *2 (5th Cir. Mar. 28, 2024) (quoting 29 U.S.C. § 213(b)(1)). This exemption involves workers engaged in the transportation of goods. *See id.*

Plaintiff argues that these defenses do not apply to the facts of this case, and Defendant does not address these defenses or respond to these arguments in its response. (Doc. No. 17 at 17; Doc. No. 18). The Court agrees with Plaintiff that there is no evidence these acts apply to Plaintiff or Defendant. The Court **GRANTS** Plaintiff's Motion for Summary Judgment on Defendant's Portal-to-Portal Act and Motor Carrier Act Defenses.

## XII.   Conclusion

For the foregoing reasons, this Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Summary Judgment. The Court **GRANTS** Plaintiff's Motion on her FLSA status as an employee. The Court classifies Plaintiff as an employee, but only after April 1, 2022. Before April 2022, this Court finds that Plaintiff was an independent contractor under the FLSA. This Court **DENIES** Plaintiff's Motion for Summary Judgment as to her overtime, minimum wage, and retaliation claims, and **DENIES** her Motion as to Defendant's affirmative defenses of the statute of limitations, good faith, and lack of knowledge. The Court **GRANTS** Plaintiff's Motion as to Defendant's Portal-to-Portal Act and Motor Carrier Act defenses. This Court **DENIES** Plaintiff's recordkeeping violation claim.

Signed on this the 15 day of October 2025.

Andrew S. Hanen
United States District Judge